9 Wis 634

# The City of Chicago

### *v.*

# Chicago, Rock Island and Pacific Railway Co. *et al.*

| 152 | 561 |
|---|---|
| 159 | 108 |
| 152 | 561 |
| 164 | 252 |
| 152 | 561 |
| 171 | 622 |
| 152 | 561 |
| 184 | 316 |
| 152 | 561 |
| 190 | 3443 |
| 190 | 8444 |
| 190 | 10445 |
| 152 | 561 |
| 196 | 8227 |
| 196 | 1229 |
| 152 | 561 |
| e201 | 1429 |
| 201 | 2430 |
| 152 | 561 |
| 207 | 4285 |
| 152 | 561 |
| 215 | 1167 |
| 215 | 8172 |

*Filed at Ottawa October 29, 1894.*

1. DEDICATION—*owner may testify to his intention.* The owner of land may testify as to what his intention actually was as to dedication, and his testimony will be considered in connection with all other facts and circumstances.

2. SAME—*testimony as to intent may be overcome by conduct.* Testimony of an intent not to dedicate will not prevail against unequivocal acts and conduct inconsistent with such intent, upon which the public had a right to rely.

3. SAME—*what will constitute—degree of proof required.* Requisites of a common law dedication are (1) an intention of the owner to donate the land to a public use, (2) acceptance thereof by the public, and (3) proof, clear and unequivocal, of these facts.

4. When an intent to donate by the owner is plainly and unequivocally manifested, either by formal declarations or by acts from which such intent may fairly be presumed, such as should equitably estop him to deny such intent, the dedication, so far as the owner is concerned, is complete.

5. But a dedication results from an active, and not a passive, state of the owner's mind, and mere non-assertion of a right will not establish it, unless the circumstances show a purpose to donate.

6. HIGHWAYS—*not acquired by user, if intention is wanting.* The rule that a highway may be acquired by user and acquiescence is a rule of *presumption,* for the purpose of determining the intent, and is inapplicable if, from all the circumstances, an intention to dedicate the land is not established.

7. The owner may show any facts or circumstances to overcome such presumption.

8. SAME—*by prescription—use by public must be adverse.* In order to establish a way by prescription, the use claimed must have been adverse, under a claim of right, exclusive, continuous, and with the knowledge and acquiescence of the owner, for twenty years.

9. The public use of a highway for that time, unexplained, raises a presumption of the other conditions, and shifts the burden of proof.

10. SAME—*when rule does not apply to a way in a city.* But the rule, both as regards prescription and dedication, does not apply to an open way in a city, affirmatively shown to have been left by the owner for his private use, though the public also used it without objection, nor where his purpose not to dedicate is manifest from the way itself, or its relation to the owner's other premises.

APPEAL from the Circuit Court of Cook county; the Hon. LORIN C. COLLINS, Judge, presiding.

Mr. JOHN S. MILLER, Corporation Counsel, and Messrs. WILSON, MOORE & MCILVAINE, for the appellant.

Mr. ROBERT MATHER, Mr. THOMAS S. WRIGHT, and Mr. PLINY B. SMITH, for the appellees.

Mr. JUSTICE SHOPE delivered the opinion of the court :

This is a bill in chancery, filed in the circuit court of Cook county, by appellees, railway companies, as complainants, to enjoin the city of Chicago, its officers, agents, etc., from interfering with complainants in the construction and maintenance of a fence along and upon certain lots in said city owned by appellees as part of their right of way, and, with the exception of narrow strips of land on either side, occupied by a passenger depot erected thereon and used by them jointly. Said lots were bounded on the north by Van Buren street, on the east by Pacific avenue, on the south by Harrison street and on the west by Sherman street. The depot building fronted on Van Buren street, and in the construction thereof said narrow strips of land were left unoccupied, and were used by the public as parts of the highways, the one on the east side, adjacent to the west line of Pacific avenue, being some twenty-seven feet wide, having been used continuously by the public, in connection with the street, since the construction of appellees' depot on said lots.

The question here involved is as to the right of ownership and control of the strips of ground mentioned, lying between appellees' depot station and the east line of Sherman street on the west, and the west line of Pacific avenue on the east. It is insisted on behalf of appellant, first, that the two strips in question were dedicated by appellees to the public use as parts of said streets, respectively, in said city; and second, that the public has been in the continued and uninterrupted use of the same,

as and for public highways, under claim of right, for a period of twenty-four years, and has therefore acquired an easement therein by prescription.

As to appellant's first contention, it may here be said that there is no claim or pretence of a statutory dedication, but it is insisted that the evidence is sufficient to establish a valid dedication at common law.

It appears from the evidence that in 1865 or 1866, appellees, being then the owners in common of a block of ground in the city of Chicago bounded by the streets above stated, caused the same to be surveyed by the city engineer, and erected thereon a passenger depot. Pacific avenue, (then known as Griswold street,) on the east, was forty feet wide, and Sherman street, on the west, for one-half the length of the block, was forty feet wide, and from thence to Harrison street, on the south, sixty feet wide. It appears from the testimony of the architect, one Boyington, who had charge of the design and construction of the depot building erected in 1865 and 1866, as well as that erected after the great fire, that there was quite a strip of land left on the east, and a smaller strip on the west, between the building and street line. In answer to the question as to what, if anything, was said to him by the officials of the railroads, at the time he was making his plans and superintending the work, with reference to the object or purpose for which the strip of ground was left on the east of the building, this witness testified : "I recollect the street line being staked out, and a consultation with the different interests of the railroads as to how much the building should cover, of the lot. The arguments were, the street being narrow, there were advantages in having the strip on the east, which would be the exit for passengers going out or going off. It would be very much to their interest to have a strip large enough to control the bus and hack approaches,— or, in other words, for their own police control of that much ground, so that if there were any objectionable

parties backing in there or making a fuss, they could order them off on to the street; that that would be as advantageous to them as it would be under the roof of the building, and they concluded to have a strip there for that purpose. I think they'put it in this form for their own accommodation, so that omnibuses and carriages might be standing on their own ground, and they could control their movements and conduct while there. That is the way they expressed themselves at that time."

Albert Keep, at the time of the trial of this cause chairman of the board of directors of the Northwestern Railroad Company, testified: "I remember the construction of the present passenger depot and the one that was burnt down in 1871. * * * I was a director of the company and member of the executive committee when the plans of that building [the old one] were in preparation and the building itself erected. The executive committee was selected by the board of directors from among its members. I remember that the depot did not extend on either side to the limits of the company's property. My impression is that about twenty-seven feet was left on the eastern side and a less space on the west side.

Q. "Did you have any conversation with Mr. Phillips, the president of the Michigan Southern Railway Company, at or about that time, with reference to the purpose for which this space was left vacant?

A. "I did.

Q. "With reference, particularly, to the space adjoining Pacific avenue, you may state what, in substance, were those conversations.

A. "I talked with Mr. Phillips in regard to the space left on the eastern side of the building, and the reason why it was left. The reason was, that the company desired to control the space where they thought it would be necessary for omnibuses to stand, so that those omnibuses might drive up on the company's grounds and receive and discharge their passengers without being liable

to be interfered with by the police or city authorities. That was the substance of the understanding, or the conclusion as the result of the understanding."

To the same effect is the testimony of Charles Paine, of New York, in 1865, and for some time thereafter, chief engineer of the Michigan Southern railroad, who testified, in substance, that the space was left for the express purpose of controlling teams, omnibuses and express wagons which should be at the station, and that it was discussed among the officers of the companies in the preparation of plans for the building.

Phillips, who at that time was president of the Michigan company, testified that various conferences and consultations were had among the officials of the roads with reference to the strips,—to what they should be devoted, —and that the object and design of the companies were to enable them to control the access to the station. "The space was actually used by carriages, omnibuses, wagons and other conveyances coming to or going from the station, to enable passengers to be received and delivered there, with their baggage, on the companies' ground. There was a covered platform running on the east side of the building. Next to that came the wall which supported the train-shed. There were several doors in that wall. There must have been fifteen or twenty, I should think, according to my recollection," and that there was no intention to leave the strips to be devoted as parts of the streets, etc. Other witnesses were produced who testified to substantially the same facts, relating to the original purpose of the companies in leaving the strips out.

It also appears that in October, 1866, after the walls of the building had been commenced, the city of Chicago entered into two separate contracts providing for the paving of certain portions of Sherman and Griswold (or Pacific) streets within the recorded lines of said streets, which lines were surveyed for the purpose by the city engineer. The cost of paving the streets was assessed

upon property benefited, the railroad companies paying their proportionate share thereof assessed against their said property. The same contractor to whom the paving of said streets was let by the city also made a contract with said railroad companies to pave the strips of land lying between the building and said street lines, which contract was performed and the paving paid for by the said companies. The evidence tends to show that, the pavement of the streets and of said strips being alike, a line of blocks was laid lengthwise in order to indicate the line separating the streets from said strips. The pavement for the railroad companies extended to a curb along the edge of a covered platform running the length of the building on either side, and, save the line of demarkation above mentioned, the pavement had the appearance of a continuous roadway, from the sidewalk on the one side to the depot platform on the other. The curb-stone along the platform was paid for by the railroad companies and put there at their request, and was extended in a straight line from the south end of the depot to Harrison street, on the south, a distance of about one hundred and seventy-five feet.

In 1871 the depot was destroyed by fire, and the following year rebuilt on the same foundation, the platforms and curb-stones on either side being reconstructed on the previous lines. In 1877, Pacific avenue, from Van-Buren to Harrison streets, was repaved under private contracts with owners on the respective sides of the street, the owners on the east side paying for twelve feet of paving, between the center line of the platted street and the outer edge of an eight-foot sidewalk in front of their premises, and the railroad companies, owning the entire frontage on the west side, paid for paving twenty feet, or the west half, of the street. At the same time the companies repaved the strip of ground in controversy, on the east side of their depot and along the west line of the street, and in order that their pavement would be

laid so as to accommodate omnibuses in backing up to the platform, Ray, the contractor, who had been so directed by the engineer of the railroad companies, had an omnibus brought to the ground and backed up to the platform, and the gutter and pavement were accordingly laid so that the step of an omnibus was convenient to the platform. The city engineer, Cheney, and at the time also inspector of the work upon the street, did not pretend to have any authority in reference to the paving of the strip, and he testified that during his connection with the department of public works of the city, from 1875 to 1890, he never had any information that the city claimed or pretended to have any ownership in or right to control the strip in question. On the contrary, his testimony tends strongly to show that he, as the proper representative of the city, regarded the strip as railroad property, and deferred, it seems, to the suggestion of Parsons, then division superintendent of the railroads, as to how the gutter should be placed, and so on, along the side of their depot.

In 1890, pursuant to ordinance of the city, Pacific avenue was again paved, and the cost thereof paid by special assessment upon property benefited. The estimate of the commissioners as to the cost of the improvement was confined to the thirty-two feet of the street proper lying between the outer edge of the eight-foot walk on the east side and the strip of land in question on the west side. The lots of appellees, by number, were assessed, as appears by the assessment roll, their proportionate share of such cost, separately, and without any reference to or exception of the strips in controversy. The lines of the proposed improvement were given by the assistant city engineer, and the contractor, Conlan, entered upon the work, and in accordance with said lines, fixed in accordance with the improvement provided for by the ordinance, placed a stone curb on the west line of the street, thus separating the strip belonging to appellees from the street proper, and thirty-two feet of road-

way was accordingly paved. After the passage of said ordinance, and before the letting of the contract, the city, by its officers, consulted appellees, to ascertain if the railroad companies would again pave their strip of property lying between their depot and Pacific avenue. The railroad companies informed the city authorities that they would not do so, and "expressed their intention to take care of their own strip there." It was suggested to the companies by the city authorities that the curb-stone along the west line of the street be put down to indicate the boundary line between the street and said strip, but on a level with the pavement, so that vehicles might pass over it. This suggestion, however, was not accepted by the companies. Property owners on the east side of the street, and opposite appellees' depot, objected to the manner in which the improvement was being made, claiming that the strip in question ought to be regarded as a part of the highway. This is the first instance we find in this record of any suggestion, from any source, that this strip of ground might be regarded as not belonging to the railroad companies, or as dedicated to the public. However, in October, 1890, and after the completion of the pavement, the owners of property on the opposite side of Pacific avenue petitioned the city council that said street be widened, by condemning for that purpose "so much land on the west side of said Pacific avenue * * * as may be found necessary and practicable for the making of such street of suitable width, considering the amount and character of business done thereon," thereby necessarily proposing that the larger part of appellees' strip of ground be condemned for such purpose. Pursuant to order of the city council the department of public works, to which the matter was referred, prepared an ordinance providing for the condemnation of a strip eighteen feet in width off the east side of the strip of ground in question, proceedings under which ordinance were still pending at the time of filing the bill in this case.

As we have seen, the strip of ground belonging to appellees was distinctly separated from the street by the curb, established in 1890, on the street line. Over a portion of the strip appellees had extended a platform from their building to said curb, and also undertaken, after the completion of the pavement, to construct a fence on the south half of the strip, enclosing an area of about four hundred feet in length, from the north line of Harrison street, and parallel with and six feet west of the said curb established by the city. The building of the fence was stopped by the police of the city, and, so far as erected, the said platform ordered by appellant to be removed, and in case of failure on the part of appellees to comply with the order, appellant threatened to have the same taken away.

As we view this record there can be no question that the railroad companies, from 1865 to the paving of Pacific avenue, in 1890, have used the strips in question for the purposes for which they were left out and originally intended. At no time during all those years did the city, by any of its officers, claim, or pretend to claim, any right or interest in said strips as a part of the public highway. The assertion of the right now insisted upon by the city seems not to have been thought of or suggested until 1890, when the property owners opposite the railroad depot complained of the way in which the street was being paved, and the idea that the land in question might be regarded as belonging to the public, and not the companies, would not then perhaps have occurred to the mind of any one interested in the improvement had the said strip along Pacific avenue been at that time paved by the railroad companies. The public authorities exercised no jurisdiction or control over the premises, save such as was exercised over other like places in the city, and on every occasion appropriate for the assertion of their private right in said strips, consistent with the uses to which they had devoted them, the railroad companies at

all times asserted and claimed such right.   The railway companies, during the many years past, paid to the city all taxes assessed by the municipality against their lots, including the strips in question, there being at no time, in any assessment or tax, a description or designation of said strips separate and apart from the lots, or any deduction in valuation of appellees' lots on account of the strips being claimed by or dedicated to the public.  While it appears that said strips were left open in order to provide easy and free access and accommodation for vehicles carrying passengers, baggage or express matter, and therefore used in this respect by the public, as well as by general travel along the street, as part of the public highway, it does not necessarily follow, from acts of this kind, that the law will regard the land as originally intended by the owner to be dedicated to public use.

It is insisted that the testimony, *now*, of former officers of the railway companies, as to what their intentions *then* were, will not alone be sufficient to revoke or nullify the acts or conduct from which the dedication is to be presumed, and that where such acts or conduct have been acted upon by the city and the public, the presumption will be conclusive of the intention to dedicate the land to the public use.   The rule doubtless is that the intent testified to, not to dedicate, will not be permitted to prevail against unequivocal acts and conduct on the part of the owner inconsistent with such intent, and upon which the public had a right to rely.   (*Lamar* v. *Clements*, 49 Texas, 354.)   And where the owner swears to what his intention was, he can be contradicted by his acts and conduct or declarations.   (*Hulett* v. *Hulett*, 37 Vt. 586 ; 1 Greenleaf on Evidence, 84, note ; *Smith* v. *Town of Flora*, 64 Ill. 93.)   But the rule in this State, and perhaps generally, is, to allow the owner to testify to what his intention actually was, to be considered in connection with all the other facts and circumstances in the case.   *McIntyre* v. *Storey*, 80 Ill. 127; *Princeton* v. *Templeton*, 71 id. 68 ; *Bloomington* v. *Cemetery Ass.* 126 id. 221.

In our opinion there is upon the record no sufficient evidence to establish a common law dedication, if the foregoing facts and circumstances be given, as they must, due credit and consideration. In order to constitute a dedication at common law, it is essential (1) that an intention on the part of the proprietor of the land to donate the same to the public use, and (2) an acceptance thereof by the public, be established by the evidence; and (3) that the proof as to these facts must be clear, satisfactory and unequivocal. The vital and controlling principle is the *animus donandi*, and whenever this is plainly and unequivocally manifested on the part of the owner of the soil, either by formal declaration or by acts from which it may fairly be presumed, such as should equitably estop him from denying such intention, the dedication, so far as the owner is concerned, is complete. Without such manifestation of intent, by either of said modes, to donate the land to the use of the public, it cannot be said that a valid dedication is possible. To make a sufficient dedication the proprietor of the soil must devote the portion thereof intended for public use to such use, and on the part of the public it must be accepted and appropriated to that use. The acts on the part of the donor and of the public, of an intention to dedicate, to accept and appropriate the land to public use, where the dedication is relied upon to support some right, must be equally clear and unambiguous. (*Fisk* v. *Havana*, 88 Ill. 208.) A dedication is not an act of omission to assert a right, but is the affirmative act of the donor, resulting from an active, and not a passive, condition of the owner's mind on the subject. "A mere non-assertion of a right does not establish a dedication, unless circumstances establish the purpose or intention to donate the use to the public." *Grube* v. *Nichols*, 36 Ill. 92. See, also, *Chicago* v. *Hill*, 124 Ill. 646; *Chicago* v. *Stinson*, id. 510; *Bloomington* v. *Cemetery Ass.* 126 id. 221; *Chicago* v. *Drexel*, 141 id. 89, and cases cited.

But it is claimed, on behalf of appellant, that the acts of appellees in leaving the strip of land on either side of their depot, and adjoining the street, unoccupied, open and free to public travel, and apparently as part of the highway, paving said strips, and otherwise improving them in conformity with the paving and improving of the street adjacent, constitute, nevertheless, a valid dedication of said strip to public use, and that the act of the public in using the strips of land in question for travel in connection with the street, with the acquiescence of appellees, was a sufficient acceptance of such dedication. It is true that long continued user by the public of land for highway purposes, and acquiescence in such use by the owner, will ordinarily, of themselves, evince an original intention to dedicate the land to public purposes. "The right of the public," says Greenleaf, (2 Law of Evidence, sec. 662,) "does not rest upon a grant by deed or upon twenty years' possession, but upon the use of the land, with the assent of the owner, for such a length of time that the public accommodation and private rights might be materially affected by an interruption of the enjoyment." So, as said by Best (2 Law of Evidence, sec. 387): "If a man opens his land so that the public pass over it continually, the public, after a user of a very few years, will acquire a right of way, unless some act be done by the owner to show that he had only intended to give a license to pass over the land, and not to dedicate a right of way to the public." This rule has been followed in numerous decided cases in this court, among which see *Alvord* v. *Ashley,* 17 Ill. 363, *Marcy* v. *Taylor,* 19 id. 634, *Maywood Co.* v. *Maywood,* 118 id. 61, and *Hiner* v. *Jeanpert,* 65 id. 430. In the last case cited it was said : "A highway may be lawfully established by public user, and recognition by the public authorities, and acquiescence of the owners of the land over which it passes. No express act of dedication is necessary, and consent may be implied from acquiescence and user by the public, and the user

does not depend upon any fixed period of time." But this rule is a rule of presumption, for the purpose of determining the intent of the owner of the land, and is therefore inapplicable if, from all the circumstances, an intention to dedicate the land to public use is not satisfactorily established by the proofs; and though there be acquiescence, with knowledge of the use by the public, without objection on the part of the owner, it is not conclusive evidence of dedication, for it may be rebutted. The owner may show any facts or circumstances to overcome and rebut the presumption. (*Kyle* v. *Town of Logan*, 87 Ill. 64.) In all cases of dedication arising by implication, it may be said that location, the nature and extent of travel over the alleged highway, the conduct and rights asserted by the parties in respect thereof, acts suffered, and explanations of the same by the owner,—in short, all the facts and circumstances tending to support or overcome the presumption,—may be shown. *Wragg* v. *Penn Township*, 94 Ill. 11; *Chicago* v. *Stinson*, *Chicago* v. *Hill*, and *Chicago* v. *Drexel*, *supra*.

Applying these principles to the facts and circumstances shown upon this record, it would seem apparent from the foregoing brief review of the evidence that there is not here that clear, satisfactory and unequivocal intention on the part of the owner to dedicate the premises to the public use, and due acceptance thereof by the public, shown by the proofs as required by the common law. The facts and circumstances disclosed afford ample explanation for the conduct of appellees in leaving said strips unoccupied, which were freely used by all, and rebut the presumption of dedication arising from such user. We are therefore of opinion that there was no valid common law dedication of the strips in question to public use.

What has been said disposes of the second contention on behalf of appellant, that the public acquired title to the strip in question by prescription. In order to establish a way by prescription, the use and enjoyment of

what is claimed must have been adverse, under a claim of right, exclusive, continuous, uninterrupted, and with the knowledge and acquiescence of the owner of the land in or over which the easement is claimed. (Washburn on Easements, 131.) In *Daniels* v. *People*, 21 Ill. 438, it was said: "Actual, adverse, open and uninterrupted possession of land by a person claiming title for the period of twenty years, confers the right to hold and enjoy the possession against the true owner. Then it follows that a user by the public of a road as a public highway for that period is abundantly sufficient to create the right." Also, in *Toof* v. *Decatur*, 19 Bradw. 207, it was said: "The use must have been public for twenty years, adverse and under claim of right, uninterrupted, and with the acquiescence and yet without agreement of the owner of the land, made within that period. The public use of it for that period as a highway, unexplained, will raise a presumption of the other conditions, and shift the burden of proof as to them.  *  *  *  This rule does not apply to an open way in a town or village, affirmatively shown to have been so made or left by the owner for his private use, though the public may also have used it without objection by him, nor where his object and purpose are manifest from the way itself, or its special relation to his other premises." See, also, *Martin* v. *People*, 23 Ill. 342; *Gentleman* v. *Soule*, 32 id. 271; *Manrose* v. *Parker*, 90 id. 581; *Dexter* v. *Tree*, 117 id. 532; *Irwin* v. *Dixon*, 9 How. 10; *Root* v. *Commonwealth*, 98 Pa. St. 170; *Onstatt* v. *Murray*, 22 Iowa, 468; *Durgin* v. *Lowell*, 3 Allen, 398.

It requires no argument or further examination of the evidence to show that many of the essential elements of title by prescription are here wanting. The user by the public of the strips in question was not adverse, exclusive, continuous, uninterrupted, under claim of right, nor with the knowledge and acquiescence of appellees, when the purposes for which the strips were left open by appel-

lees, and the character and extent of their business, are taken into consideration, as must be done.

Having passed upon the principal and important questions raised, we do not deem it necessary to extend this opinion by discussion of the minor objections raised.

We are clearly of opinion that the court below, in awarding the injunction and making the same perpetual, decreed correctly, and its decree will be affirmed.

*Decree affirmed.*