## THE VILLAGE OF PEOTONE

*v.*

## THE ILLINOIS CENTRAL RAILROAD COMPANY.

*Opinion filed December 22, 1906.*

1. ROADS AND BRIDGES—*statute creating highway by user applies to unenclosed roads.* Section 1 of the Road and Bridge act, (Laws of 1887, p. 263,) which declares roads used by the public for fifteen years to be public highways, applies to both enclosed and unenclosed roads, but in the latter the acts of the public indicating the location of highway must be more pronounced than in the former.

2. SAME—*intention of land owner not material in case of statutory user.* In determining whether a strip of ground on the right of way of a railroad company has become a highway by user under the statute, the intention of the company that such highway was to be for the use of its lessees is not material if the public has used it for the statutory period as a public highway, and has, in such use, exercised unequivocal authority thereover.

3. SAME—*effect where road is near depot and yards.* To sustain a claim of a highway by user, under the statute, over unenclosed right of way in close proximity to the railroad depot and yards, the acts of the public in the use of the strip as a public road must be more pronounced than might be necessary under other conditions.

4. SAME—*what establishes a highway by user.* A highway by user, under the statute, over a portion of a railroad right of way is established by proof that for some thirty-five years the road has been used by the public as a highway, and improved, graded and cared for by the village, without interruption, at its own expense, the railroad company never having made any improvements thereon, although it knew the road was used by certain of its tenants in connection with their respective occupations. (*City of Chicago* v. *C., R. I. & P. Ry. Co.* 152 Ill. 561, distinguished.)

SCOTT, C. J., and CARTWRIGHT and HAND, JJ., dissenting.

APPEAL from the Circuit Court of Will county; the Hon. R. W. HILSCHER, Judge, presiding.

This is an appeal from the circuit court of Will county to reverse a decree granting a permanent injunction restraining the village of Peotone from further exercising authority and control over the west thirty feet of the appellee company's right of way.

In 1859 the Illinois Central Railroad Company sold section 24, in township 33, north, range 12, east of the third principal meridian, through which the company's right of way extends, to Hosmer A. Johnson, except one hundred feet on each side of the center of the track as then laid. Johnson laid out a part of said section into what is now called the village of Peotone. The plat was filed in the recorder's office August 3, 1859, and recorded. The Illinois Central railroad runs through the village in a north-easterly and south-westerly direction. The lots lie north and south and are of rectangular shape, except a part of them, which are irregular in shape on account of the right of way of the Illinois Central Railroad Company running diagonally through the town. No road or street was ever platted or laid out between the right of way of the company and the lots adjoining it. Beginning at Crawford street, on the north, there is a sixteen-foot alley running south part of a block between the right of way on the west side of the track and the lots on the west. The cross-streets running east and west, and which extend across the right of way, beginning at the north with Crawford street, are named, as they lie, Crawford street, North street, Main street, Corning avenue and Wilson street. The public claims as a road the west thirty feet of the company's right of way west of the track from Crawford street to Wilson street. Main street was opened across the track originally, then, later, Corning avenue, Crawford street and Wilson street, in the order named. The first store building erected along this strip was built in 1858, in the block between Main and North streets. The next store building was built in the same block about 1860 or 1861 and used as a drug store. In that block, prior to 1867, there had been erected a store building, in which had been the post-office for fifteen and a half years from 1870, and also a hotel and saloon. Two additional buildings had been placed there prior to 1875, both used as store buildings. In the next block north, between North and

Crawford streets, there were two buildings standing in 1867,—a dwelling and a blacksmith shop,—and by 1875 there was added another dwelling and a hay-press. In the block between Corning avenue and Main street there stood, in 1867, a store building, the village hall and a livery barn, and by 1875 there had been added a hotel building and a tin-shop. In the block south of that there stood, in 1867, a saloon and hotel, a dwelling house, a carpenter shop and a slaughter-house, and by 1875 another building had been added to the block. The town hall burned in 1883, and the village, which owned the property, now uses it for its engine house. A public well is also on the same property. A witness made a rough drawing, which was introduced in evidence, which showed that in the year 1880 there were about twenty-two buildings on the lots adjoining the right of way on the west and facing Railroad street. All these buildings were erected along and facing the west thirty feet of the company's right of way, which is known and will be spoken of as Railroad street, with no other means of access than over the strip of ground in question. Trees were planted about thirty years ago in front of a dwelling house next to Wilson street, about six feet from the west line of the company's right of way and upon it. Other trees were planted in line in front of a dwelling in the block between Crawford and North streets, but not upon the right of way. The remaining part of the west one hundred feet of the company's right of way, next to the tracks, has been used by firms dealing in lumber, coal, etc., except that part used by the company for its depot.

Prior to 1865 the only buildings along the west side of the tracks and east of Railroad street were the depot and an elevator. The depot was built in 1857, on the north side of Main street and next to and west of the track. Later, coal-bins were erected between the depot and elevator. In 1862 or 1863 the depot burned and was re-built where the old one had stood. This second depot was burned about

1878, when the new one was built on the north side of Main street, east of the track. The elevator is now used as a storage building, and coal-bins are erected where the old ones stood before the fire. The right of way next to the tracks, in a block north of this one, is occupied by a lumber and coal yard and the office and platform of a firm which presses and ships hay from Peotone. In the block between Main street and Corning avenue an elevator was built in 1868 or 1870, about one hundred feet from Corning avenue, and another was built in the same block, about fifty feet from Main street, shortly afterwards, both on the right of way and east of Railroad street. The north elevator burned in 1883 and was never re-built. In the next block south, between Corning avenue and Wilson street, a lumber yard was established in 1875 or 1876. The right of way in this block, not including the west thirty feet, is now used for a lumber yard.

Ever since the elevators, grain offices, coal sheds, lumber yards, etc., have been erected, it is in evidence that the west one hundred feet of the appellee's right of way, including the thirty feet in question, has been constantly used by tenants of appellee, appellee's agents and the public, in connection with its business as a common carrier. The owners of these industries lease the ground of the company. The leases, prior to 1870, were destroyed by the Chicago fire, but the company offered memoranda which showed the original leases extended to the west line of the right of way, thereby including the strip known as Railroad street. It is in evidence that some of the lessees were apprehensive that the other lessees might exercise their right to the ground leased, in such a manner as to shut off the other lessees and the public from access to their places of business, and that Mr. Comstock, a lessee, in 1868 asked that the company should not include in the leases the west thirty feet, and thus leave a passageway which all might enjoy. The chief engineer of the company, Mr. Clark, who served

in that capacity from 1859 to 1877, and who had charge of the leasing of the right of way, directed that the west thirty feet should not be included in the leases, and since 1868 the strip now known as Railroad street has not been included in any of the leases to the owners of the industries along the right of way.   Mr. Clark also testified that he knew the street had been used by the public and the lessees since 1858 or 1859, and it was for this reason that the west thirty feet was not leased, but that there was no intention on the part of the company to dedicate the strip to the public.

The village was incorporated in 1868, and since that time has exercised authority over the land in controversy and treated and used the same as a street and highway.   In its natural state the ground known as Railroad street was very low.   Water stood across the street in wet times between Main street and Corning avenue, and horses were unable to draw loads through it because of its miry condition.   The strip began to be used about 1859 or 1860.   The people first drove diagonally from Wilson street across the lots adjoining Railroad street on to it, thence north to the business district, including the industries of the lessees of the company.   Later they went through bars at Wilson street on to this strip, but the bars were removed at an early day.   In 1863 a citizen worked out his poll-tax on Railroad street.   He helped grade the street in 1873 and again in 1883, in each instance being paid by the city.   Another citizen worked out his poll-tax by hauling dirt on this strip in 1873.   In 1870 the village graded the street from Wilson street to Crawford street and has maintained it ever since.   About 1872 the village put twelve car-loads of dirt on Railroad street.   It was hauled from Kankakee over appellee's road, the freight being paid by the village.   The agent at Peotone knew where the dirt was placed, but officials of the company deny any knowledge of it.   Culverts have been put in where needed and tiling laid to make the strip passable.   Private citizens did work there, especially the lessees, two

of whom, members of different firms, placed in Railroad street about twelve car-loads of stone chips at an expense of $200. They testified they did it, as lessees, for their own accommodation, principally to have teams pass easily to their places of business. Two other lessees also did filling on the strip for their own benefit.

With reference to grading this street, John Conrad testified that he was street commissioner of the village of Peotone in 1871 and had charge of the street in question and kept it in repair; that along this street was a place so much of a swamp and so low that it was called "No bottom," and that into that hole he hauled many hundreds of loads of dirt; that the work was done by direction of the board, and that from 1871 to 1895 he had seen the street commissioner working on that street. Mr. Eichenlaub testified that in 1873 and 1874 he hauled dirt, by wagon, on Railroad street between North street and Main street,— some in the fall of 1873 and more in 1874; that in 1874 he graded between North street and Crawford street with a scraper and made a grade there; that there had been a grade there before, which had flattened out, and he scraped it up on both sides; that the grade was sixteen inches in the center and sloped to the sides to six inches, and extended from North street to Crawford street to the hay-press; that there was a grade between Main street and North street, which was two feet high and had been filled in; that the grade extended for about twenty rods, where there was a low place and where the water stood at the time; that the grade was built from one side, because on the west side were the buildings, and the grade had to be so sloped as to carry the water away from them and so that the buildings could be reached; that the buildings all faced on that street; that in some places it was filled in two feet or more, as it was low all along between Main street and North street on Railroad street; that in 1873 or 1874 the grade extended all the way along the west side of the track, the whole dis-

tance from Wilson street to Crawford street; that it was used as a road, and there was lots of grading between Main street and Corning avenue and a grade was established the entire way; that between North street and Crawford street there was a ditch on both sides of the grade, as there were no business houses adjoining the grade on the west, and a culvert was put through the grade between those streets. Fred Wahl testified that in 1873 he contracted with the village to grade Railroad street from Main street north to North street; that he put in a grade sixteen feet wide at the bottom and fourteen feet on top and fifteen or more inches high, and was paid for it by the village; that he got clay to make the grade from the railroad grounds; that the grade so made was measured and accepted by the commissioners, and extended to within thirty feet of North street.

The evidence discloses that in 1869 sidewalks were built along the west side of Railroad street from Wilson street to North street by the lot owners, and at the time of bringing suit the walk extended to Crawford street; that between Wilson street and Corning avenue the walk was entirely upon the land in question and had been kept up by the village since 1869; that between Corning avenue and Main street the walk, after it was originally constructed, was burned, with some buildings, and when it was re-constructed it was so built that about two and one-half feet of it extended over and along Railroad street; that between Main street and North street the walk has been removed, as the block is occupied by business buildings, the porches or awnings extending in front of the buildings constituting the sidewalk, and it is disclosed by the evidence that all the walks have been, since the village was organized, kept up by it. It is also shown that a number of hitching posts were placed in front of the buildings between Main street and North street and have stood there for over twenty-five years. Sidewalks were built from Wilson to Main street along the west line of the right of way about 1868 and 1870

on this strip. A fire destroyed most of them, and they were re-built on private property part of the distance, it seems. From Main to Crawford street a walk ran on the lot lines, except about fifty feet, where it was on the right of way about two and a half feet. This part was re-built about 1868 or 1870.

In 1870 Mr. Raines, the proprietor of the hay-press at Crawford street, got permission of the village board, and the Illinois Central Railroad Company also, to build a tramway across the street for the purpose of hauling baled hay over to the platform. This has been maintained since then, but a gap has been left for the public to pass through. In 1893 Schroeder & Sons petitioned the village board for permission to occupy the street with their store building while they built a new one on the old site. It was granted. Mr. Schroeder testified that he was told by a trustee to ask permission of the appellee. This is answered by the trustee, who said he advised getting permission of the company to use the ground east of the strip, so that teams could pass around the building as it would then stand. The lease was obtained from the company to part of Railroad street, which they occupied for one hundred and twenty days. As room was left for the public to pass around, no trouble ever arose.

During a difficulty with the village, in 1892, some of the officials of the appellee, upon being asked to grade Railroad street, are said to have remarked: "You are using that street; grade it yourselves." All of them deny that they said those words, or anything, in substance, like them. Both the appellant and the appellee show that the railroad company did no work on the thirty-foot strip. Appellee's officers testified they did not know the village was grading and graveling the street or that it exercised any control over it, but they knew the public used it in doing business with the stores, as well as the lessees and appellee. During the growth of the business houses along this street various employees of the company whose duty it was to look after

the right of way have been in Peotone many times. Agents of appellee testify that the strip was left unenclosed for the necessary and convenient transaction of the business of the company and its lessees. In dealing with the grain elevator the haulers would drive to the dump without touching Railroad street, but it was convenient and customary to turn and come back to the scales by means of it. There is no access to the coal bins of Mr. Tobias, located on the right of way, except over this thirty-foot strip. It is testified to that it is not necessary to use this strip to reach the industries on the right of way, but it is very convenient, and that the public has used this strip as other streets, but not as an immediate approach to those industries.

A member of the village board testified that the village had trouble with the appellee with reference to an ordinance pertaining to placing a flagman at Main street, and another ordinance restricting the rate of speed of trains passing through Peotone to ten miles per hour; that after their passage the appellee asked to have a conference with the board to see if the village could not get along without the flagman, and if graveling and other work might not be done to lessen the danger; that the appellee was asked to furnish gravel for Railroad street and the village would put it on; that this was refused, but the appellee afterward furnished gravel at half rates for the streets of the village. The village placed some of the stone and gravel furnished, between Main street and Corning avenue, on Railroad street, in 1883. In 1892 the appellee graveled Main street and Corning avenue one hundred feet east and seventy feet west of the center of the track, being out to this thirty-foot strip.

About 1880, after the depot had been moved to the east side of the tracks, appellee built a single drive east of the thirty-foot strip, between the ditch and the tracks, from Main street north toward the elevator. In 1890 the appellee widened the drives already made next to the track in the block between Main and North streets. Drives east of the

strip were made between the tracks and lumber yards from Corning avenue south, by appellee, and cinders and stone were placed in the drives into some of the lumber yards and approaches to elevators. The evidence shows that appellee did this for the convenience of those taking goods from the cars or loading into them. It was testified to that a great part of the freight was handled without ever being taken over to the depot. These drives were approached from the various streets running east and west into which the team driveways open.

In 1892 the appellee sent leases to the part of this strip known as Railroad street, between Main street and Corning avenue, to be signed by the village authorities, but they were returned without any action taken upon them by the board. Resolutions were passed by the village board in 1893 claiming this street, a few months before graveling it, and the street commissioner was ordered to notify all parties to remove obstructions, and a copy of such notice was sent to the appellee. There were line posts erected in 1895 by appellee, and notices posted warning all that Railroad street belonged to appellee, and in July of the same year a resolution was passed by the village board, a copy of which was sent to the appellee, ordering the appellee to remove all its posts, signs and obstructions placed by it, its agents or servants, upon Railroad street, and if not removed within ten days the superintendent of streets was ordered to remove them, whereupon appellee applied for an injunction to restrain the village of Peotone from exercising any control over Railroad street in any manner whatever. A temporary injunction was granted. The special master to whom the case was referred to take testimony and report the proofs, with his conclusions of law and fact, found that there was a road dedicated by appellee and accepted by the village, and that the village had an easement by prescription, based on dedication. The circuit court sustained the exceptions to the master's report and found that appellee was

in the exclusive and uninterrupted possession of the strip in question, and that the village had never acquired any part of it for the purpose of a street by prescriptoin, dedication or purchase, and enjoined the village of Peotone from further exercising authority and control over it in any way.

COWING & YOUNG, for appellant.

HOWARD M. SNAPP, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

Appellant does not claim that Railroad street was ever platted as a street or conveyed by appellee for such purposes. It bases its claim of right to the street upon the grounds of dedication, prescription under the common law and user under the statute. All of these grounds are earnestly urged and elaborately discussed by appellant in its brief and argument. Appellee discusses the questions arising upon the claim of dedication and common law prescription.

From a careful examination of the evidence, an epitome of which is contained in the statement of the case herein, we are impressed with the view that there is much evidence in the record that strongly supports the contention of appellant upon all the grounds upon which it predicates its defense. A proper disposition of the case does not require that all the grounds be sustained or discussed, and to do so would unnecessarily extend this opinion without subserving any beneficial purpose, as the main controversy arises more from the facts than the law. We cannot resist the conclusion that under the evidence a public highway by user, under the statute, is established, even though the statute be treated as a declaration of common law prescription except as to the period of limitation, and that the circuit court erred in not so finding.

In 1872 the General Assembly made a general revision of the road laws, and by section 1 of the act declared that all roads "used for ten years" are public highways. (Laws

of 1872, p. 675.) Since that time a similar statute, varying only in the period of user, has stood upon our statute books. In 1883 the General Assembly declared all roads "used by the public as a highway for twenty years" to be public highways. (Laws of 1883, p. 137.) In 1887 this same law, being the first section of the Road and Bridge act, was so amended that it reads as follows: "That all roads in this State which have been laid out in pursuance of any law of this State, or of the Territory of Illinois, or which have been established by dedication, or used by the public as a highway for fifteen years, and which have not been vacated in pursuance of law, are hereby declared to be public highways." (Starr & Cur. Stat. 1896, chap. 121, sec. 1.) By the provisions of this statute, which was in force when this action was brought, a road that has been used by the public as a highway for fifteen years and has not been vacated is a public highway. The variation in the periods of limitation, as fixed by the different statutes above mentioned, is immaterial in this case. It is unimportant, in the consideration of this case, whether the term be ten years or twenty years that the road shall be used to constitute it a highway, as the evidence in this case shows that if there is a highway here by user at all, it arises from a user by the public of the premises in question as and for a highway for more than thirty-five years prior to the bringing of this action. The statute applies alike to enclosed and unenclosed roads, the only difference being that in the case of an unenclosed or unfenced road the acts of the public with reference to it, from which the conclusion arises that the use by the public has been of such nature as to constitute the *locus in quo* a highway, must be of a more pronounced character than in the case where a highway is fenced out and used by the public. The user by the public of this strip for a highway by travel over and across it is not disputed.

It is contended by appellee that being a part of its right of way and in reasonable proximity to its depot, and being

unenclosed, sufficient facts do not appear to establish in the public the assumption of a highway over this Railroad street, as against the appellee, its owner, and it may be conceded that where grounds are near to a railroad depot and freight yards more pronounced acts on the part of the public should be required before the conclusion is reached that the public has acquired the right to the premises as a highway than might under other or ordinary circumstances be required. In the case at bar it is shown that from 1858 or 1859 this street has been used by the public as a highway,— that is, that it has been traveled during all that time. It is also shown that prior to 1871 it was improved as a highway by being graded and drained. It is also shown that in 1868 the village of Peotone was incorporated, and the undisputed evidence is that from 1871 to the time this action was brought the village authorities constantly and regularly exercised jurisdiction over this street; that appellant improved it by filling, grading, draining, and placing crushed stone and macadam upon it; that dirt that was placed upon it was shipped over appellee's road by appellant and paid for by appellant for the improvement of that street; that hitch-racks were put in the street for the accommodation of customers of those running places of business along the street; that trees were planted in the street by property owners for the ornamentation of and shade for their homes and business places; that sidewalks were laid upon the street; that for substantially its entire length business houses and homes were built facing the street, with no other means of egress or ingress than said street, among which were a town hall, and later the engine house for the fire department, and the town well, and that permanent structures and businesses were established and maintained with reference to it. That appellee, in 1868, recognized the existence of this condition of things cannot be questioned. Its general engineer, Mr. Clark, at that time had the control of its right of way, and executed the leases between it and persons doing business

224—8

upon its right of way at said village. Previous to that time its leases had read from the center of its main track to its west line or right of way, but at that time it was represented to Mr. Clark that the business interests of its lessees required that there should be no interruption with the travel along this Railroad street, or the strip of ground which it is now claimed to be Railroad street, and that if a tenant were given a lease which included that strip of ground he might insist upon the control of it and deny the passage to other tenants or to the customers of the tenants. The leases were then made to read with a certain frontage on the railroad and extending back from the center of the track west, seventy feet of it, and so the leases remained from that time on. Mr. Clark states that at that time he knew that the strip was being traveled by the public. At no time after that, until just prior to the bringing of this suit, did appellee, so far as this record discloses, attempt in any manner to exercise jurisdiction or control over this strip of ground. The evidence fails to show that appellee, or anyone for it, ever expended an hour's time or a cent in money in improving this part of the right of way for travel. By the occupation of its tenants upon the east side of this street in dispute, and the business men and residents of the town of Peotone on the west side of the street, the use of the street for a highway was a public necessity, and in the condition it was when the town was first platted, travel over it, much of the time, was impossible. Repairs were necessary and were made by the public, other men, in their individual capacity, doing filling and furnishing stone, and appellant also made repairs through its officials and at its expense. It is true that it is shown that some of the tenants of appellee materially aided in the improvement of this street; but it is shown that they did so by no agreement with appellee or because of any obligation they owed to it, but that whatever was done was in furtherance of their own business interests and for the accommodation of the public.

Appellee states that it did not intend to dedicate this street to public use. What appellee's intentions were is immaterial in determining whether the road existed by prescription. The statute does not require that the use by the public for the period named in it shall have been with his or its intention to dedicate the use of it to the public, and so we held in *Township of Madison* v. *Gallagher,* 159 Ill. 105, where it was claimed by the owners of the land over which the road was claimed that the alleged road was laid out by them, as adjoining owners, for their own private way, that it was immaterial, under the statute, whether the owners intended the road to be a private road or not, and there said (p. 109): "In order to determine whether a road is a public highway or not, by prescription, the question is whether it has been used by the public as a highway for the period named in the statute." We further said: "It is such use which makes it a public highway if it is a public highway; and the fact of such use is not affected in any way by the original intentions of the adjoining owners, or by their consent or opposition when the road first began to be used as such." And so in the case at bar, whether appellee intended that such road should be opened for the use of the public or only for the use of itself and its lessees and customers is immaterial, if, in fact, the public has used it for the statutory period as a public highway, and has, in such use, done such unequivocal acts as indicate that such use was the exercise of a right claimed by the public.

Appellee further says that it had no knowledge that the public was making the improvements shown by the evidence to have been made upon this street at public expense or in the manner or to the extent claimed. It is true that appellee is a corporation, and can only have notice through its officers and agents of matters and things affecting its rights. Appellee was operating its railroad through Peotone before there was any town at that place. It established its depot before the town of Peotone was built. It invited business,

and the existence of the depot and the railroad was doubt-
less calculated to and did bring together the inhabitants as
a settlement which finally resulted in the town. It sold to
Johnson, who platted the town. The town was growing
from 1858 to 1895. The building done with reference to
this street, and the exercise of public and private acts with
reference to it, were of such character that we cannot in-
dulge appellee in its contention of ignorance of the many
transactions during all that time that were taking place
with reference to this street that should materially affect its
rights and interests in it. As was said in *Dimon* v. *People,*
17 Ill. 416: "But while no presumptions or inferences can
be made against those who have neither actual or construc-
tive notice of such user, everyone is presumed to know of
and notice such use of a way over his land."

Appellee cites a number of cases which it insists are
very similar in their facts to the case at bar, and in which it
was held the right of a public highway did not exist, among
which are *City of Chicago* v. *Chicago, Rock Island and
Pacific Railway Co.* 152 Ill. 561, *Williams* v. *New York
and New Haven Railroad. Co.* 39 Conn. 510, and *Rost* v.
*Commonwealth,* 98 Pa. St. 614. We have examined those
cases, and find that in each of them where it was claimed a
public highway existed, the owner of the *locus in quo* had
made the improvement thereon and fitted it to use in con-
nection with his private business, and in each instance did
all that could be done, taking the use into consideration, to
maintain a distinction between it and that portion of the
highways adjacent to it that belonged to the public. The
case of *City of Chicago* v. *Chicago, Rock Island and Pacific
Railway Co. supra,* was where a dispute arose between the
city and the railroad as to a strip of ground adjoining the
railroad company's depot, which was left for omnibuses and
carriages to stand upon. In 1866 the city of Chicago paved
the street adjoining this strip, the railroad paying for its
proportionate share of the pavement of the public street,

and at the same time paved, at its own expense, the disputed ground, placing a line of blocks between the public street and the part owned by the railroad. The curb-stones, which were placed next to the depot, were paid for wholly by the railroad company. In 1871 the depot was destroyed by fire and was re-built on the same foundation. In 1877 the street was again paved by the property owners and the railroad company re-paved the disputed strip. In 1890 the street was again re-paved by special assessment, the railroad company paving its own portion of the disputed strip. In the case of *Williams* v. *New York and New Haven Railroad Co. supra,* which was over a disputed strip of right of way claimed as a public highway adjoining the railroad company's depot, it appeared that the railroad company graded the strip in question, rendered it fit for use in connection with its business, and kept it in repair at its own expense up to the time of the bringing of the suit. The *Rost case, supra,* was where the owner of a ferry opened and kept in repair a lane leading through his land to his ferry, which was used by the public in going to the ferry, for more than twenty years. The ferry was abandoned and the lane closed, and it was held that the public acquired no right to the lane as a highway. All these cases, we think, are entirely different from the case at bar. Here appellee did not improve Railroad street for its own use or for the use of anybody. In fact, it did not improve it at all. When it did improve the cross-streets that crossed its right of way, by placing stone and gravel upon them and grading them up to render them suitable for travel, it improved them east of its track one hundred feet from the center and west of its track only seventy feet, or to Railroad street, thus leaving out the thirty-foot strip here in controversy, so that the similarity between the cases cited and the case at bar is not carried out or sustained.

If the question were one of negligence on the part of appellee in failing to keep this thirty-foot strip of ground in

proper condition, by which damages accrued to some individual rightfully there, no one would think of contending that in thirty-five years it was not the duty of appellee to ascertain the condition of its right of way that the public was using or was likely to use in connection with the business of the public and appellee or its lessees, and we think where the rights of the company are to be affected and the acts are so unequivocal and the improvements of so extended and material a character as were those made upon the road in question by the public, appellee must be charged with notice thereof.

It cannot be seriously contended that, so far as the public was concerned, it was not claiming to be exercising a right in traveling over this road as a highway. The manner and extent of the use, the expenditure of public moneys thereon and the building of the town with reference thereto, all conclusively show that the public regarded it as a public highway. There is no claim, and if there were there is no evidence to support it, that the exercise of the public right was interrupted in any material manner or to any reasonable extent, or for any such time, as to affect the operation of the statute.

The foregoing opinion was filed at a former term and a rehearing allowed, but after a further consideration given to the questions involved we adhere to the views originally entertained and to the conclusions then reached. We have therefore adopted the opinion heretofore filed.

The decree of the circuit court is reversed and the cause remanded to that court with directions to dismiss the bill.

*Reversed and remanded.*

CARTWRIGHT and HAND, JJ., and SCOTT, C. J., dissenting:

It is not contended by the village that said strip was ever laid out as one of the public streets of said village, but it is contended that it has become one of the public streets of said village either by dedication or by prescription, or by both.

It appears from the evidence that at the time the Illinois Central Railroad Company laid its tracks across section 24, township 33, north, range 12, east of the third principal meridian, that section being the section upon which said village is located, it established a station and erected a station house upon the west side of its tracks located upon said section. The section in 1859 was sold by the railroad company to Hosmer A. Johnson, except a strip one hundred feet wide upon each side of the railroad tracks as then laid, which was reserved by the railroad company for right of way purposes. Shortly after the purchase by Johnson of said section he platted a portion thereof upon both sides of said tracks and adjoining said station house. The railroad at that point runs in a south-westerly and north-easterly direction. The streets of the village, which run east and west, beginning at the north, are Crawford, North, Main, Corning and Wilson streets. No street was laid out adjoining the right of way of the railroad company upon the west, but the lots abutted upon the right of way except for a short distance south of Crawford street, where was located a sixteen-foot alley between the lots and the right of way. Soon after the land was platted the railroad company removed its fences adjoining its right of way through the platted portion of said section, and that portion of its right of way has since remained unfenced and has been used as station grounds by the railroad company. Lots were sold in the platted portion of the section, and purchasers soon commenced building residences and erecting business houses fronting along and upon the west line of the unfenced right of way of the railroad company. The railroad company constructed a side-track extending through the platted portions of the section upon the west side of its main tracks, which connected with said tracks near Wilson street upon the south and Crawford street upon the north, and the land comprising its right of way immediately adjoining said side-track upon the west was thereafter devoted to purposes connected with its business as a common

carrier,—that is, there were erected thereon elevators, lumber yards, coal sheds and similar buildings. For a time the persons occupying the right of way west of the side-track held leases from the railroad company for the land occupied by them from the side-track to the west line of the right of way, but after a time the strip in controversy was omitted from the leases. The village of Peotone was incorporated in 1868. Said strip was low and swampy, and to make the same passable for loaded teams, the persons whose business property was located upon the railroad company's right of way and the persons whose property fronted upon the west line of the right of way filled in said strip with dirt and stone chips to a considerable extent, and the village, after its incorporation, improved said strip by filling, grading and draining the same. The persons whose residence and business property abutted upon the right of way on the west, planted trees in front of their property, hitching posts were set by them along the west line of the right of way, and a sidewalk was laid either by the property owners or the village along the west side of said right of way and across the east and west streets of the village, and the post-office, the town hall and the town well were located upon property abutting upon said strip, and said strip was used by the public generally in going to and from the dwellings and business houses located upon the west side, and to said station house, elevators, lumber yards and coal sheds, etc., located upon the east side of said strip, without objection from the railroad company, from the time the station was located at said point up to the time of the bringing of this suit. In 1893 the strip was paved by the village, and the cross-streets, where they passed over the right of way of the railroad company, were paved by the railroad company from the east line of its right of way to the east line of the said strip. About that time a controversy arose between the railroad company and the village over the enforcement of an ordinance requiring the railroad company to place a flagman at the streets crossing the railroad com-

pany's right of way in the village and regulating the rate of speed at which trains should run while passing through said village, and the question then seems to have been raised for the first time whether said strip belonged to the railroad company as a part of its station yards and right of way or to the village as a public street. The railroad company thereupon set posts at the street intersections along what it claimed to be the west line of its right of way, to mark the line between its right of way and the private property upon the west, and the village served notice upon the railroad company to remove said markers and other obstructions from said strip, which controversy culminated in this litigation.

The first question to be considered is, does the evidence found in this record show a common law dedication of said strip by the railroad company to the village of Peotone for a public street? In order to constitute a dedication, at common law, of lands for a public street, it must be made to clearly and unequivocally appear that the land owner intended to donate his land to the public for a public street and that the public have accepted the same for such purpose. (*City of Chicago* v. *Chicago, Rock Island and Pacific Railway Co.* 152 Ill. 561; *Town of Wheatfield* v. *Grundmann,* 164 id. 250.) Here the railroad company held the particular strip which it is claimed it dedicated to said village as a public street, as a part of its station yards and right of way in said village. On the land east of and adjoining said strip were located its station house, which was under its direct control, and elevators, coal sheds, lumber yards, etc., which were used by its lessees. In order that it might conveniently perform its duties as a common carrier it was necessary that said station grounds should remain unfenced and accessible to the public, to the end that the public might have access to its station house and to the places of business of its lessees. The location of its station grounds at this point was peculiar. The person who platted the land which now comprises said village failed to provide a means of access to said

station grounds except by way of the streets, which crossed
the railroad company's right of way almost at right angles.
It was necessary, therefore, in order that the public might
have access to the station house, the elevators, coal sheds,
lumber yards, etc., located upon the railroad company's right
of way and station grounds at that point, that the strip in
question should be left free from obstructions. The station
grounds were in use by the railroad company for a public
purpose, and the fact that the railroad company left said
strip free and unobstructed under the circumstances dis-·
closed by this record, and that the public traveled over the
same at times when not engaged in transacting business
with the railroad company or its lessees, is not, in our view,
evidence of an offer on the part of the railroad company to
dedicate said strip to said village as a public street.

It is held in this State that where the owner of premises
situated in a village or city leaves open a way for his private
use, the doctrine of dedication or prescription does not apply
to such private way, even though the public also use it with-
out objection. (*City of Chicago* v. *Chicago, Rock Island
and Pacific Railway Co. supra; Lambe* v. *Manning,* 171 Ill.
612; *City of Chicago* v. *Borden,* 190 id. 430.) It is also
held that the dedication of lands to a public use, such as a
public street, must result from an active, and not a passive,
state of the owner's mind, and that a mere non-assertion
of a right will not establish a dedication unless the circum-
stances are such as to show a purpose to donate the land
to a public use. (*City of Chicago* v. *Chicago, Rock Island
and Pacific Railway Co. supra.*) The officers of the railroad
company testified that the omitting of the strip in question
from the leases of persons occupying portions of said sta-
tion yards for purposes connected with the railroad was not
with a view to dedicate said strip as a public street, but to
enable persons having business with the railroad company
at that point, and with its lessees, to reach all portions of its
station grounds without being interfered with by any of its

lessees. This evidence was competent as bearing upon the question of an offer to dedicate said strip to the village as a public street. *City of Chicago* v. *Chicago, Rock Island and Pacific Railway Co. supra.*

We are of the opinion the evidence found in this record does not show, clearly and unequivocally, that the railroad company intended to dedicate said strip to the village as a public street, but think the evidence shows the strip was set aside by the railroad company as a private way for the accommodation of the public and for the accommodation of its lessees while engaged in doing business with the railroad company at said station as a common carrier, and the fact that the public may have traveled over said strip without objection for many years did not have the effect of converting said private way into a public street.

The next question which arises upon this record is, does the evidence show the establishment of a public street over said strip in favor of said village, as against the railroad company, by prescription? In order to substantiate the claim that said strip by prescription had become converted into a public street, it devolved upon the village to establish by satisfactory proof that it had been in the possession of said premises for the full statutory period; that its possession was hostile or adverse, actual, visible, notorious and exclusive, continuous and under a claim of color of title. (*Rose* v. *City of Farmington,* 196 Ill. 226.) It is clear that the possession or use of this strip by the village was not hostile to the railroad company, and that such possession or use was not exclusive, but that its possession and use were only permissive, and no prescriptive right can be predicated upon a mere permissive use. *O'Connell* v. *Chicago Terminal Transfer Railroad Co.* 184 Ill. 308; *Rose* v. *City of Farmington, supra.*

In this State a public street can only be acquired by dedication or prescription, or by a proceeding carried on in the manner pointed out by the statute. As the title of the rail-

road company to said strip has never been acquired by the village of Peotone in either of those modes, the decree of the circuit court enjoining the village of Peotone and its officers from interfering with the railroad company in the enjoyment of said strip as a part of its station grounds and right of way was correct.