(No. 20973.—

ALBERT J. LEONARD *et al.* Plaintiffs in Error, *vs.* MARGUERITE PEARCE *et al.* Defendants in Error.

*Opinion filed April 23, 1932—Rehearing denied June 14, 1932.*

Nelson, Burton & Quindry, for plaintiffs in error.

Werner W. Schroeder, A. F. Beaubien, and Run-yard & Behanna, for defendants in error.

Mr. Justice Orr delivered the opinion of the court:

The plaintiffs in error, Albert J. Leonard and others, (herein called complainants,) filed their bill for an injunction in the circuit court of Lake county on behalf of themselves and all others similarly situated, against Marguerite Pearce, George Pearce and August Froelich, (who will be referred to herein as defendants,) to restrain the defendants from interfering with the complainants and others in the use of the waters of Lake Zurich for navigation, fishing, hunting, bathing and similar uses. No useful purpose would be served by a recital of the voluminous pleadings by which the parties finally reached an issue. A large amount of evidence was heard before a master in chancery, whose findings and report concluded with the recommendation that the complainants' bill be dismissed for want of equity. Objections to the master's report were overruled and ordered to stand as exceptions before the chancellor. When issue was finally joined the chancellor overruled the exceptions, and after hearing additional evidence rendered a decree confirming the report of the master and dismissing the bill for want of equity. This writ of error was sued out on the theory that the right of freehold—*i. e.,* the title to the bed of the lake—is directly involved in this proceeding.

The bill alleges that the complainants are the owners in fee simple of lands bordering on Lake Zurich and of lands adjacent thereto, with the right of access to the lake; that they acquired such lands relying upon the fact that the lake was and is a navigable body of water which had been

dedicated to public use. The bill states that the defendants, claiming that they own the fee to large portions of the bed of the lake, have served notice on the complainants and the public generally that the waters of the lake overlying their land cannot be used by boats, or for fishing, hunting or bathing, unless certain fees are paid to the defendants. The complainants assert that the lake from the time of the establishment of the Federal government has been, and still is, a navigable body of water; that it has been, and is now, used for trade and commerce for the carrying of passengers and merchandise; that it has been meandered, and the title to the bed of the lake rests in the State of Illinois in trust for all of the people of the State. The complainants further allege that the defendants' claims to title are based upon certain supposed or presumed patents from the United States, which, if issued, were against the express provisions of the Federal constitution, the Ordinance of 1787 and the Enabling act of 1818 admitting Illinois into the Union. It is also claimed that the original patentees, and their successors in title, dedicated the waters of the lake to all lawful uses by the public, including those mentioned in the bill, and that the public accepted the dedication and thereafter used it continuously. The answers of the defendants were a general and specific denial of the allegations made in the bill, the sufficiency of which was also attacked.

By its decree sustaining the findings of the master in chancery the court held, in effect, (a) that the complainants own certain tracts of land bordering on the lake or in its vicinity; (b) that the defendants own in fee simple most of the lake bed; (c) that the defendants' titles are based upon patents from the United States; (d) that the lake varies in depth from two feet near the shore to thirty-three feet at the deepest point, is one and one-half miles long, one-half mile wide and covers about 235 acres; (e) that the lake has no outlet or inlet; (f) it has never been meandered;

(*g*) it is non-navigable; (*h*) that the defendants have good title to the lands underlying the waters of the lake; (*i*) that there has never been any dedication to the public of the lands underlying the lake nor of the waters of the lake; (*j*) that the public has never acquired any right in and to the waters of the lake or the use thereof, and that the complainants have not established any individual right to the use of any part of the lake or the waters thereof or of the land underlying the waters; (*k*) that what use the public has made of the lake from the time of the earliest settlers to the present has been a permissive use and has not affected the rights of the defendants to use and control such portions of the lake as are owned by them, and (*l*) that the complainants have failed to establish the allegations of their bill and that the equities of the case rest with the defendants.

The primary issue in this case, as held by the chancellor, is whether the lake is navigable, or to the same ultimate effect, is it a public body of water?

On the question of the navigability of the lake we must first consider the early history of the land involved. This originally comprised four quarter sections located in sections 17, 18, 19 and 20, all centering at a common point in what is practically the center of the lake. The land in section 17 must be considered separately, but the three quarter sections in sections 18, 19 and 20 can be treated as one tract. The evidence conclusively shows that the three tracts in sections 18, 19 and 20 were sold by the United States to John Forsythe in 1856 and that he received a patent therefor. In 1861 the Surveyor General for Illinois and Missouri certified that State agent Hale had chosen the three tracts as swamp land according to the Swamp Land act of 1850, and it was further certified by that official that the land was swamp land within the meaning of that act. Under the act of 1857, which supplemented the act of 1855, the State of Illinois was entitled to the purchase money received from Forsythe by the Federal government for those

three tracts of land. The Secretary of the Interior confirmed the finding that the three tracts were swamp land under the meaning of the Swamp Land act of 1850 and that the land had been erroneously sold by the United States. The State of Illinois subsequently received the purchase money from the United States, and this money was turned over to Lake county. The tract in section 17 never came under the operation of the Swamp Land act of 1850 or of the acts of 1855 and 1857. This was due to the fact that the tract was sold by the United States in 1841, while the act of 1850 only applied to lands unsold on and after September 28, 1850. There is no dispute but that the general characteristics of the tract in section 17 are the same as those of the three tracts in the other sections. The tract in section 17 comprises a part of the lake and has always been a part thereof, although covered with water much shallower than the other portions in question. Since there is practically no difference between the tracts, the conclusion necessarily follows that there is no legal difference in so far as the issues in this suit are concerned.

The evidence shows that Lake Zurich was never meandered. The presumption therefore arises that it was not navigable. (*State of Illinois* v. *New,* 280 Ill. 393.) This presumption is not overcome as to section 17 by any evidence that it was navigable. On the contrary, it is shown that this portion of the lake contains the shallowest water and the greatest amount of aquatic plants. What this court has said in the recent case of *Daggett* v. *Wilkinson,* 345 Ill. 244, is directly in point and definitely controls the question of whether Lake Zurich is navigable or non-navigable. There we said that the decision of the Secretary of the Interior, as the head of the general land office, in determining whether lands were swamp or overflow, was the determination of a question of fact by a tribunal specially authorized and empowered to settle such questions, and is conclusive unless attacked directly on the ground of fraud or mistake.

This view is fully supported by an earlier decision of this court. *Dupue Rod and Gun Club* v. *Marliere*, 332 Ill. 322.

The complainants alleged that Lake Zurich is a public body of water, as they claim the original patentees and their successors in title dedicated that body of water to the use of the public. The defendants denied such dedication and argued that the evidence relied upon by the complainants has failed to clearly and satisfactorily establish either an intention to dedicate or an acceptance thereof by the public. The evidence reveals that in the early days this body of water was unenclosed and free use was made of it for hunting, fishing, boating, picnicking, bathing and ice cutting. All of the surrounding territory was sparsely inhabited and virtually unfenced. No one was under the necessity of first securing permission to go upon lands and waters for hunting, fishing and other forms of recreation. The evidence clearly demonstrates that the thought of adverse use never occurred to those on recreation bent. All was virgin country, practically open to everyone. In those times the village of Lake Zurich contained but very few families. One witness testified that in the territory surrounding the lake there were not more than one hundred people. This type of use of the lake and the surrounding land persisted for many decades, as the growth in population was slow, and many of the pioneer families continued to reside upon the land obtained by their ancestors from the government. A family by the name of Fox owned a large number of acres on the shores of the lake. Some witnesses for the complainant stated that this family claimed to own a large portion of the lake bed but made no effort to keep the people off the lake. In the latter part of the decade of the 70's recreation seekers from a distance began to frequent the lake in the summer months. The Fox family then started what we would now term a summer resort. Visitors were taken for pleasure rides on the lake in a very small steamboat then owned by one of the members of the

Fox family. This boat made circuits of the lake, plying portions of it not owned by the Fox family. This practice was never forbidden by the other land owners, as they in turn had shared the use of the entire lake with each other and with the Fox family. Other resorts were opened from time to time as the lake continued to draw increasing numbers of visitors. The local population catered to the vacational desires of these visitors and reaped profit from the increasing business. The lake was also used to a limited extent in the winter time for skating, horse racing and fishing. Patronage of the early resorts about the lake continued to grow, both summer and winter, for many years. Boats were supplied, as well as added facilities for bathing and fishing, and such use of the lake was in the main unrestricted. During the last ten or fifteen years the popularity of the lake as a summer resort reached such proportions that various owners of land on or near its shores subdivided their properties. Cottages were erected, some of which were sold outright while others were retained by their owners and rented to visitors. The owners and renters of cottages were allowed access to the lake. In some instances an easement was granted by the land owner over his land to the edge of the lake. Some of the cottage owners erected their own piers, while other piers were erected by the subdividers for the common use of those who bought lots of them. Some of these piers were posted to show that they were for private use and efforts were made to prevent bathers and picnic parties from using them. The public use of the lake as a recreational center has grown so that the week-end visitors in recent years have at times numbered several thousands. The village of Lake Zurich has grown from a few persons to a place of about three hundred permanent inhabitants, with a permanent summer population of double that number. Many owners of the shore line and parts of the lake rent parking and picnicking space along its shores, and also supply boats, with the use of piers, to their customers.

These rented boats travel all over the lake, and in reciprocal fashion the boats rented or owned by others likewise travel over all portions of the lake, regardless of the ownership of the lake bed or shore line.  Such was the common practice at the time this suit was instituted.  Commercial ice companies had command of large portions of the lake either through leases or by direct ownership.  The largest company maintained a superintendent on its property, and this man, a witness for the defendants, said that his duties required him to police the area controlled by the company.  In the summer time he prevented fishermen from driving poles in the lake bed, which, if allowed to remain, would seriously interfere with the ice harvest.  He also prevented people from fishing through the ice on land owned or controlled by the ice company.  Vegetation in the water was mowed so as not to interfere with the cutting and moving of ice.  Other testimony showed that after the ice was cut it often became necessary to pay a number of land owners for the privilege of rafting it across their properties in the lake.  It was also shown that different persons over a course of many years had built and maintained fences out into the lake on their boundary lines for the purpose of preventing persons from entering their lands from the water side.  A witness related how she compelled a railroad to cease pumping water through a pipe that extended into that part of the lake bed owned by her.  Other witnesses testified that since the lake had become popular as a summer resort they were compelled to erect signs and fences in order to prevent trespassing on their property both on the shore and in the lake.  An operator of a motorboat paid $50 to the owner of land in the lake for the privilege of running his boat over that area during the summer season.  In behalf of the defendants it is conclusively shown that the owners of the land underlying the waters of the lake have from time to time made conveyances and long-term leases thereof.  The proof shows that the land on the shore of and

in the lake has been platted and sold, and a large number of owners now have record title to the bed of the lake. Taxes have always been paid by these owners of the land underlying the lake. In one instance the State secured a part of the lake bed for highway purposes by securing a dedication thereof from the owner.

It is not contended by the complainants that any question of express dedication under the statute or dedication by deed is involved in this case. If any easement was dedicated to the public by the owners of land underlying Lake Zurich it was a common law dedication. No ambiguity exists in this State concerning the law in relation to common law dedications to public use. The decisions of this court over a long term of years have clearly defined that law. The question of dedication to a public use is a question of fact—*i. e.*, one of intention. (*Moffett* v. *South Park Comrs.* 138 Ill. 620.) The intention of the owner to dedicate the land or waterway, and the acceptance thereof by the public, must be by proof that is clear and satisfactory of both, (*DuPont* v. *Miller*, 310 Ill. 140,) and it must be unequivocal. (*City of Chicago* v. *Chicago, Rock Island and Pacific Railway Co.* 152 Ill. 561.) The intention to dedicate cannot be inferred from the fact that no assertion of ownership was made by the purported donor. It is not the omission to assert a right, but it is the affirmative act of the donor, coming from an active condition of his mind on the subject, that determines the intention. Unless circumstances establish the intention to donate the use to the public a mere non-assertion of his rights by the owner does not establish a dedication. (*City of Chicago* v. *Hill*, 124 Ill. 646.) In the matter of road dedications mere travel is not sufficient to show dedication. (*Palmer* v. *City of Chicago*, 248 Ill. 201.) Mere permissive use cannot ripen into a prescriptive right regardless of the length of time such permission to pass over the land of another is enjoyed, and the use of vacant, unenclosed, unoccupied land is presumed

to be by consent and not adverse. (*Parker* v. *Rosenberg,* 317 Ill. 511; *Illinois Central Railroad Co.* v. *Stewart,* 265 id. 35.) Those who rely upon mere naked possession as the foundation of their title against others who claim title by deed must show actual occupancy or possession, and it must be visible, exclusive, continuous and adverse. The possessory evidence cannot consist of mere acts of trespass or permissive use. *Duck Island Fish Club* v. *Whitnah,* 306 Ill. 284.

Under the prior decisions of this court it is clear that the permissive use of Lake Zurich as enjoyed by the early settlers of that vicinity exhibited no intent to dedicate the lake to public use, nor was the use made of the lake at any time such as might properly be called an adverse use. Throughout its early history, and particularly during its later period, we find efforts made by the owners of the shore and of the land underlying the waters of the lake to assert their rights of ownership whenever they believed those rights were in danger of impairment by the general public. The record shows an ever-increasing tendency by the owners of the lake to prevent trespassing upon their property. The erection of fences extending into the waters of the lake, the charging of admission to bathing beaches, parking spaces, picnic grounds, pier privileges and for the use of boats cannot be construed as evidence of dedication. On the contrary, these acts definitely show a common endeavor of the owners of the lake to profit from their holdings. The granting of easements by subdividers over property along the shore line in order that cottage purchasers or renters might have access to the lake also shows that these owners still considered their portions of the lake to be under their own control. The record is silent as to any adverse use by the public that could be worthy of classification as evidence of an intention to dedicate. There is abundant evidence that such uses as the public enjoyed in the waters and shore lines of the lake were uses permitted by the own-

ers of the fee. A development of obnoxious conditions caused the owners of the lake to terminate the free and unrestricted use of its waters which the public had formerly enjoyed. This action simply amounted to a cancellation of the permissive right previously extended. Under such circumstances the judgment of the owner must, and does, prevail.

The decree of the circuit court was correct and is therefore affirmed.

*Decree affirmed.*